UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DAMISO LEE,

Plaintiff,

v.

Case No. 25-cv-0518-bhl

EVAN OLSON and DEXTER SCHLEIS,

Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

In this civil rights lawsuit, Plaintiff Damiso Lee claims that Wauwatosa Police Officers Evan Olson and Dexter Schleis violated his Fourth and Fourteenth Amendment rights when they shot him during an April 5, 2022 traffic stop. Defendants seek summary judgment, arguing that the record establishes that Lee was armed with a gun, refused their repeated instructions to surrender, and, after falling and dropping the weapon, retrieved it and then ran toward one of the officers, rendering their use of deadly force objectively reasonable under the circumstances. Defendants also argue that they are entitled to qualified immunity. While this incident was unfortunate, the Court agrees that Defendants' use of deadly force was objectively reasonable and will therefore grant their motion for summary judgment and dismiss this case.

## BACKGROUND

Damiso Lee was a seventeen-year-old resident of Milwaukee, Wisconsin on April 5, 2022. (ECF No. 22 ¶1; ECF No. 12-1 at 10:3–4.).) One month earlier, on March 6, 2022, he reported his silver 2008 Pontiac Grand Prix as stolen. (ECF No. 22 ¶6.) In response, the Milwaukee Police Department listed the car as stolen on the National Crime Information Center database and entered it onto a "hot list." (*Id.* ¶8.) Cars on "hot lists" are linked to stolen vehicles, wanted persons, or other law enforcement investigations. (*Id.* ¶9.)

The Wauwatosa Police Department outfits its squad cars with Automatic License Plate Readers (ALPRs) that detect and read license plates. When applicable, the ALPR will transmit an alert to the squad car's mobile data computer informing officers that a particular license plate and

vehicle is on a "hot list." (*Id.* ¶¶10–11.) The alert also informs the officers of the "level of criminality" associated with the alert. (*Id.* ¶12.)

At some point after reporting his car as stolen but before April 5, 2022, Lee recovered his car but did not notify the Milwaukee Police Department of the recovery. (*Id.* ¶14.) Lee's silver Pontiac therefore remained on the "hot list" as a stolen vehicle on April 5, 2022.

On the night of April 5, 2022, Lee was driving his car while in possession of a black Glock Model 22 handgun. (*Id.* ¶15.) After picking up a food delivery order for DoorDash but deciding to keep the food for himself, Lee began driving to his mother's apartment at North 92nd and West Congress Street to pick up his brother. (*Id.* ¶¶16–17.) As he drove on North 92nd, he passed Officer Olson, a Wauwatosa Police Department Officer driving a squad car equipped with an ALPR. (*Id.* ¶19.) At approximately 10:45 p.m., Officer Olson received an ALPR alert that a silver Pontiac going northbound on North 92nd Street was on a "hot list." (*Id.* ¶19.) The ALPR alert was categorized as "high," indicating that the vehicle had been involved in a felony offense. (*Id.* ¶20.) Officer Olson radioed dispatch to inquire about the license plate, and dispatch confirmed the vehicle had been reported stolen by two young black men, described as being 17 years old, 6'3" and 180 pounds, and 18 years old, 5'7" and 140 pounds. (*Id.* ¶¶22, 24.) Officer Olson also learned that the vehicle was registered to Tonya Schroder[1], a white woman in her thirties. (*Id.* ¶23.)

Officer Olson located the silver Pontiac and decided to conduct a "felony traffic stop" to investigate. (*Id.* ¶25.) Because he considered the stop to be high risk, he requested that Officer Schleis, another Wauwatosa Police Department officer driving nearby, assist and approach from the opposite direction. (*Id.* ¶¶26–27.) While waiting for back-up to arrive, Officer Olson continued monitoring the car and saw Lee park in an alley behind an apartment complex. (*Id.* ¶28.) There, Officer Olson observed Lee open and close the driver's door without exiting, turn the engine off, and then open the driver's door a second time and leave it open. (*Id.*) Concerned that Lee might flee on foot or enter the apartment building, Officer Olson directed Officer Schleis to move into the other side of the alley to block Lee's path. (*Id.* ¶29.) Officer Olson then pulled his squad car behind Lee's car and turned on his emergency lights and spotlight. (*Id.* ¶¶30–31.) Officer Schleis moved his squad car into the alley, blocking the potential escape route down the alley, and also activated his emergency lights and spotlight. (*Id.* ¶34.)

[1] Schroder is Lee's cousin. (*Id.* ¶7.)

Events quickly escalated. Officer Olson opened his driver's door and directed Lee to stop and show his hands. (*Id.* ¶35.) Lee left the Pontiac, wearing a black hooded sweatshirt with a large front pocket and holding a white takeout container. (*Id.* ¶36.) Officer Olson immediately recognized the outline of a handgun in Lee's front sweatshirt pocket. (*Id.* ¶37.) Officer Olson left his squad car and unholstered his firearm, shouting "stop, I said stop, do not reach for that gun." (*Id.* ¶38.) Ignoring the instructions, Lee reached for the sweatshirt pocket with his hand and then turned and ran. (ECF No. 16-1 at 0:41–46.) As he ran away from Officer Olson and around the front of his car, Officer Olson shouted "He's got a gun. Gun, gun, gun, gun!" (*Id.* at 0:43–0:48.)

By this time, Officer Schleis had left his squad car to block Lee's flight, causing Lee to change direction. (ECF No. 22 ¶¶43–44, 50; ECF No. 17-1 at 0:40–44.) As Lee ran in front of Officer Schleis's squad car, he tripped and fell forward, dropping the handgun. (ECF No. 17-2 at 0:40–0:42; ECF No. 22 ¶53.) Lee stood up and retrieved the gun. (ECF No. 22 ¶55; ECF No. 12-1 at 82:13–20.) He then turned away from Officer Schleis and ran forward, moving closer to Officer Olson, still holding the gun. (ECF No. 22 ¶¶56, 60; ECF No. 17-2 at 0:44–45.) Officer Olson ordered Lee to "drop the gun. Drop the gun." (ECF No. 22 ¶57.) Officer Schleis also shouted "Drop the fucking gun." (*Id.* ¶58.) As this was occurring, Officer Schleis had moved to the passenger side of his squad car, and briefly lost sight of Lee, but heard Officer Olson's commands to drop the gun. (*Id.* ¶59.) Lee disregarded these commands and did not drop the gun, after which Officer Olson fired multiple shots. (*Id.* ¶62; ECF No. 16-1 at 0:48–52.) Officer Schleis asserts that he heard those gunshots, but could not see Officer Olson from his position, and believed Lee had fired the shots. (ECF No. 17 ¶¶63–65.) He also fired shots at Lee. (ECF No. 22 ¶65.) All the gunshots were fired over just a three-second time period. (*Id.* ¶69.) Lee was hit by the shots and fell face down to the ground, at which point both officers stopped shooting. (*Id.* ¶¶67, 68; ECF No. 17-1 at 00:47; ECF No. 16-1 at 0:53.) The entire episode lasted just fourteen seconds. (ECF No. 16-2 at 0:39–00:53.)

After the shooting stopped, the handgun remained on the ground about one foot from Lee's left hand. (ECF No. 22 ¶71.) Lee remained face down on the ground, with three gunshot wounds. (*Id.* ¶¶71, 81.) Over the next few minutes, other police officers arrived and Lee communicated that he no longer had the gun but had been shot. (*Id.* ¶¶72–77.) Officer Olson retrieved a ballistic shield from his squad car to safely approach Lee, and then, with another officer's help, pulled Lee

away from the handgun to provide medical aid until the Milwaukee Fire Department arrived on scene to assume Lee's medical care and transport him to the hospital. (*Id.* ¶¶77–81.)

Lee later acknowledged at his deposition that he was armed, had his handgun in his front pocket, and had heard the officers' commands, but rather than complying, had planned to flee while armed. (*Id.* ¶¶85–87.) Lee also admitted that he retrieved the gun and was shot while holding it. (ECF No. 12-1 at 82:13–83:17.)

## LEGAL STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could influence the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Upon such a showing, the burden shifts to the opposing party to "make a showing sufficient to establish the existence of an element essential to that party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). This burden is not onerous, but the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

If the parties assert different characterizations of the facts, the Court must view the record in the light most favorable to the nonmoving party. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432,

437 (7th Cir. 2000). The Court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. *Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021). "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the nonmoving party's claims." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

"Video evidence that conclusively shows what happened allows a court to set aside factual disputes and decide what clearly established rules of law govern." *Perez v. Guetschow*, 173 F.4th 862, 865 (7th Cir. 2026) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). But it "isn't the *existence* of a video recording, but its *quality*, that enables a court to conclude without a trial that one side rather than another must be right about the facts." *Id.* (citing *Raddant v. Douglas County*, 170 F.4th 583, 590–92 (7th Cir. 2026); *Steinhoff v. Malovrh*, 170 F.4th 647, 653–54 (7th Cir. 2026)).

**ANALYSIS**

Defendants assert they are entitled to summary judgment because the evidence establishes that their use of deadly force was objectively reasonable under the circumstances. (ECF No. 18.) Lee resists this conclusion and insists he was running away from both officers when he was shot, rendering Defendants' use of force unreasonable. (ECF No. 23 at 7.) Lee's position is contradicted by the evidence presented, including video recordings of the incident. Officer Schleis's dash camera captured the incident clearly and it both refutes Lee's version of his actions and confirms that Defendants' use of force was objectively reasonable. Accordingly, the Court will grant Defendants' motion for summary judgment.

A police officer violates the Fourth Amendment when he or she uses force that is not objectively reasonable. *Graham v. Connor*, 490 U.S. 386, 397 (1989). An officer's use of force is judged from the perspective of a reasonable officer at the scene and "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. A police officer may constitutionally use deadly force when he reasonably believes that a suspect's actions place him, or another person in the immediate vicinity, in imminent danger of death or serious bodily injury. *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018); *Sherrod v. Berry,* 856 F.2d 802,

805 (7th Cir. 1988). Courts also recognize that police officers must make immediate decisions about the amount of force necessary under uncertain, dangerous, and rapidly changing circumstances, and review the totality of the circumstances with this fact in mind. *Horton*, 883 F.3d at 950; *Graham*, 490 U.S. at 396–97. In addition, the availability of less severe alternatives does not render the use of deadly force unconstitutional. *Horton*, 883 F.3d at 950.

The dispositive question here is whether Officer Olson and Officer Schleis reasonably believed Lee posed a threat of death or serious bodily injury based on the information they knew at the time of the shooting. *See Horton,* 883 F.3d at 950, 952; *see also Doxtator v. O'Brien*, 39 F.4th 852, 861–62 (7th Cir. 2022). The evidence confirms the reasonableness of their belief. Officer Olson initially stopped Lee based on the ALPR alert and his subsequent conversation with dispatch, both of which informed him that Lee was driving a stolen Silver Pontiac Grand Prix. (ECF No. 22 ¶¶20–22.) Although Lee in fact owned the car, the officers had no way to know that because he had reported the car as stolen but had not notified the police that he had recovered it. (*Id.* ¶13.) Moreover, rather than explaining that the car was his to the officers, Lee chose to flee, ignoring Officer Olson's commands and doing so while armed with a visible handgun. Further, after falling and dropping the handgun, Lee picked it up and began running again, despite Officer Olson's instructions to the contrary. (ECF No. 17-2 at 0:42–45.) Indeed, the officers gave Lee multiple opportunities to surrender before resorting to deadly force, including after he retrieved the handgun. (ECF No. 22 ¶¶38, 57–58.) Finally, perhaps most importantly, after getting up and retrieving the gun, Lee continued to disregard both officers' instructions while moving in the direction of Officer Olson, while still holding the handgun. (ECF No. 22 ¶¶60–61; ECF No. 17-2 at 0:44–0:45.) It was at that point that Officer Olson and Officer Schleis used deadly force.

Lee asserts that the officers' use of force was unreasonable because he was running away from them. (ECF No. 23 at 7–8.) In support, he argues that "the video evidence clearly shows that Lee is facing away from the officers and is running away from them." (*Id.* at 7.) He notes that courts should not "accept 'visible fiction' when reviewing video evidence" and should view the facts "not only in the non-movant's favor, but also 'in the light depicted by the videotape.'" (ECF No. 23 at 7 (citations omitted).) But Lee does not identify what part of the video evidence contradicts Defendants' version of events. He also does not cite any specific portion of any video recording in responding to Defendants' proposed undisputed facts. While he offers citations in his own proposed undisputed facts, he merely points to the entire timestamped portion of the body

camera footage that depicts the interaction, ignoring that he changed directions multiple times during his brief attempt to escape. (*See, e.g.*, ECF No. 21 ¶13 (citing ECF No. 17-2 at 00:38–00:48.).)

Contrary to Lee's argument, the video evidence does not contradict Defendants' version of events. In fact, the video contradicts his own version of events. By turning away from Officer Schleis and running forward, Lee moved closer to Officer Olson, and the video evidence from Officer Schleis's squad car dash camera clearly shows this. (ECF No. 17-2 at 00:44–00:45.) Moreover, Lee attempts to split hairs by arguing over his precise angle of travel and his exact positioning in relation to Officer Olson. This is the type of second guessing of split-second decisions courts are expressly warned to avoid. *See Horton*, 883 F.3d at 950. These events transpired over fourteen seconds. Both Officers Olson and Schleis had to make quick decisions while faced with an armed, noncommunicative suspect ignoring their repeated orders, and attempting to evade arrest.

Lee also improperly focuses on his own conduct *immediately* before Defendants fired their weapons. This misses the point. The Court must consider the totality of the circumstances, as known or reasonably perceived by Defendants, during this brief interaction, not just the exact moment at which they fired. *See Barnes v. Feliz*, 605 U.S. 73, 79 (2025) (rejecting the Fifth Circuit's "moment-of-threat" rule that focused on the precise moment at which an officer chose to use deadly force and instead reiterating that courts must consider the totality of the circumstances, which includes the facts and events leading up to the moment at which force was used). During this less-than-fifteen second interaction, Defendants learned Lee was armed with a gun and saw him ignore repeated commands to stop, then rearm himself after he fell, ignore further commands to drop his gun, and ultimately move closer to Officer Olson, while still holding his gun. These circumstances supported both Officer Olson and Officer Schleis's reasonable belief that Lee posed a threat of imminent grave bodily harm to Officer Olson.

**CONCLUSION**

For the reasons discussed above, the record establishes that Officers Olson and Schleis are entitled to summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment, ECF No. 11, is **GRANTED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, at September 29, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge